**Bennett, Giuliano, McDonnell & Perrone, LLP**
**Attorneys for Defendant Fernando Torres-Negrón**
**225 West 34th Street, Suite 402**
**New York, New York 10122**
**Telephone:    (646) 328-0120**
**Fax:             (646) 328-0121**
**William R. Bennett, III (WB 1383)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

FELIPE ROBLES VÁSQUEZ p/k/a RALDY                    NO. 06 CV 0619
VÁSQUEZ and CAMPESINO MUSIC                           (Mc Mahon)
ENTERTAINMENT GROUP, INC.,

                                    Plaintiffs,

        -against-

FERNANDO TORRES-NEGRÓN,

                                    Defendant.

-----------------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


Defendant, Fernando Torres-Negrón (hereinafter "Torres"), by and through his

attorneys, Bennett, Giuliano, McDonnell & Perrone, LLP, submits herein this

memorandum of law in support of his motion for summary judgment to dismiss the

complaint on the grounds that as a matter of law (1) plaintiffs' claims are time barred and

(2) Torres' song *Noche de Fiesta* does not infringe on plaintiff Felipe Robles Vásquez

p/k/a Raldy Vásquez's ("Vásquez") copyright of the song *Nena Linda*.

## PRELIMINARY STATEMENT

This matter is intimately related to several actions in Puerto Rico, <u>Torres-Negrón v. Rivera, et al</u>, 02 Civ 1728; <u>Torres-Negrón v. Musical Production</u>, 02 Civ 1729 and <u>Torres-Negrón v. J&N Publishing et al.</u>, 05 Civ. 1216 (the "Puerto Rico Actions"). Plaintiffs' counsel, Mr. Sheinbaum, represented defendant J&N in Puerto Rico.

This action was filed after Torres' settlement with the majority of the defendants in the Puerto Rico Actions and a week before trial commenced in the Puerto Rico Actions. In addition, this action originally named as defendant two lawyers representing Torres in the Puerto Rico Actions.

## FACTS

Torres is from the rural town of Aibonito, Puerto Rico. (Declaration of Fernando Torres-Negrón dated January 18, 2007 at ¶ 1; referred to hereinafter as "Torres Dec. at ¶___".) Torres developed an interest in music at an early age and began taking music classes when he was eight (8) years old. (Torres Dec. at ¶ 2.) By junior high school he began playing percussion instruments and was chosen to become a member of a band comprised of students selected from all schools in the district. (Torres Dec. at ¶ 3.) After five years of playing with the band, at age fifteen, he began playing with different artists and orchestras as a freelance percussionist. (Torres Dec. at ¶ 3.) At the age of sixteen he started writing lyrics. (Torres Dec. at ¶ 4.)

In 1993, Rubén Cañuelas, a friend of Torres who sang merengue music in a cover band named *Tempo Merenguero*, asked Torres to write some songs for the band. (Torres Dec. at ¶ 5.) Cañuelas gave Torres a cassette containing several songs performed by *Tempo Merenguero* so that he could "get a feel for the style" that *Tempo Merenguero*

2

played. (Torres Dec. at ¶ 6.) Torres was asked to write something "a bit more fast paced, more sort of an aggressive tune." (Torres Dec. at ¶ 6.) After listening to the cassette, Torres wrote the lyrics *Noche de Fiesta* to be sung to a merengue bomba rhythm (Torres Dec. at ¶ 7.) After writing the lyrics on a piece of paper, Torres recorded himself singing the song *Noche de Fiesta* while clapping his hands to a merengue bomba rhythm on an audiocassette that Canuelas took and played for *Tempo Merenguero*. (Torres Dec. at ¶__.) Torres never saw the audiocassette again, but allowed *Tempo Merengureo* to perform *Noche de Fiesta*. (Torres Dec. at ¶__.)

Canuelas told Torres that a musical entrepreneur named Antonio Rivera ("Rivera") heard *Tempo Merengureo* performing *Noche de Fiesta* and liked it. (Torres Dec. at ¶ 10.) Canuelas asked Torres if he had more songs to submit to Rivera. (Torres Dec. at ¶ 11.) Torres wrote a second song, *Bebo por Ti* and sent a cassette to Rivera for consideration. (Torres Dec. at ¶ 12.)

In late 1993, without Torres' consent, *Noche de Fiesta* and *Bebo por Ti* were included in a commercial phonorecord released by the musical group Gozadera entitled "Bailando y Gozando con Gozadera". (Torres Dec. at ¶ 13.) Rivera never sought Torres' authorization to record and release *Noche de Fiesta* or *Bebo por Ti* nor did Rivera inform Torres that the phonorecord including his songs had been released. (Torres Dec. at ¶ 14.)

In 1994, Torres learned that his songs were included in this first phonorecord when he heard it played over the radio. (Torres Dec. at ¶ 16.) Shortly, thereafter, on January 19, 1994, Torres registered his songs with the American Society of Composers, Authors and Publishers (hereinafter "ASCAP") (Torres Dec. at ¶ 17.) Torres learned of ASCAP during a conversation he had with the plaintiff Vásquez in or about late 1993

3

when the two met at a club in Puerto Rico. Vásquez advised Torres to register his songs with ASCAP to protect his copyright. (Torres Dec. at ¶ 18.)

After releasing the first phonorecord, Rivera, without Torres' knowledge or authorization, sold the master to J&N (a defendant in the Puerto Rico Action) for $10,000.00. J&N proceeded to release and re-release versions of *Noche de Fiesta* without Torres' authorization. J&N released a version of the phonorecord in the United States (hereinafter the "second phonorecord".) J&N also released a compilation of merengue music hits, entitled Merenhits '94, which included *Noche de Fiesta* (hereinafter the "third phonorecord") (Torres Dec. at ¶ 20.) Several years later, J&N included *Noche de Fiesta* in a re-release of a merengue compilation, distributed by what is now known as Sony BMG (hereinafter the "fourth phonorecord") (Torres Dec. at ¶ 20.) Torres became aware of the existence of the second, third and fourth phonorecords between 2001 and 2002. (Torres Dec. at ¶ 21.)

Torres learned he needed to copyright his songs in order to file his legal claims in Puerto Rico. Torres, thereafter, registered *Noche de Fiesta* along with his other songs in the U.S. Copyrights Office. A Copyright Certificate for *Noche de Fiesta*, #PAU2-624-261 was issued to Torres on January 31, 2002. (Torres Dec. at ¶ 23.)

In 2002 and 2005, Torres filed actions in the District Court of Puerto Rico for copyright infringement of three of his lyrical compositions entitled *Noche de Fiesta, Bebo por Ti* and *Triste Final*. The cases were entitled <u>Torres-Negrón v. Rivera</u>, et al. 02-CV-1728 <u>Torres-Negrón v. Musical Production</u>, 02 Civ 1729, and <u>Torres-Negrón v. J&N Publishing, et al.</u> 05-CV-1216. (Torres Dec. at ¶ 29.) Prior to trial, Torres settled his claims against several defendants. (Torres Dec. at ¶¶ 31-35.) Plaintiff seeks here to

disgorge Torres of his right to the settlement funds based upon the alleged infringement of *Nena Linda.*

On the eve of trial in the Puerto Rico Actions, J&N proposed inclusion of a new witness that had not been previously disclosed during discovery - - Mr. Raldy Vásquez, the plaintiff herein. Mr. Vásquez, who claims that *Noche de Fiesta* infringed on *Nena Linda*, admitted at trial in the Puerto Rico Actions, and at deposition in this matter, that in 1993 he heard *Noche de Fiesta* being performed by the group Gozodera. Upon cross-examination at trial Mr. Vásquez testified as follows:

Q:    Mr. Vásquez, your defense is that the song *Noche de Fiesta* copies *Nena Linda*; right?

A.    That is correct.

Q.    When did you learned about this copy?

A.    It's been years.

Q.    How many years?

A.    I heard it ever since it came out.

Q.    So it is fair to say that you heard *Noche de Fiesta* in 1993, when it came out?

A.    That is correct.

Q.    An your learned that, but you didn't do anything in 1993; Right?

A.    No.

Q.    In 1994?

A.    No.

Q.    '95?

A.    No.

Q.    Any year of the decade of the nineties.

A.    No.

Q.    And 2001 and 2002 and 2000 and three and 2005, did you do anything?

A.    No.

(Trial Transcript for Torres-Negron v. Rivera et al., Day Five Volume I, pp. 69-70, Appendix pp. 156-158.)

During deposition in this case, Vásquez testified as follows:

Q.    When did you first hear the song *Noche de Fiesta*?

A.    In the year that they were promoting it, 1993.

Q.    At that time what did you do after you first heard the song?

A.    I listened to it. It was a group that didn't grab my attention.

Q.    After hearing the song *Noche de Fiesta* in 1993, that group was performing that song did not grab your attention?

A.    No.

(See Deposition Transcript of Vásquez at p. 38, lines 4-15 a true and correct copy of the relevant transcript pages are hereto as Exhibit A.)

Vásquez cannot read or write music (Exh. A, Vásquez Dep. Trans. P. 13, line 13-24; p. 16 lines 4-7.) Vásquez did not file a copyright for *Nena Linda* until November 3, 2005. (A true and correct copy of Vásquez's Copyright application is attached hereto as Exh. B.) Thereafter, in January 2006, four years after Torres filed his copyright for *Noche de Fiesta*, Vásquez commenced this action.

The plaintiffs' nominated expert, Mr. Angel Fernandez, testified at deposition that the songs *Noche de Fiesta* and *Nena Linda* were different. (See Deposition Transcript of Angel Fernandez at p. 16 line 1-6; a true and correct copy of the relevant pages of the Fernandez Transcript is Exh. C.) In fact, Fernandez admitted that there are several key differences between the songs. (Exh. C p. 16-17 at lines 14-25, 1-5.) Fernandez obviously admitted that the lyrics are different (Exh. C, p. 17 lines 3-5.) Likewise, Fernandez admitted that the songs had different musical introductions. (Exh. C, p. 25, lines 15-17.) He also admitted that the rhythm of the songs were different as a result of the difference in lyrics and syllables (Exh. C, p. 17 lines 15-20; p. 20 lines 20-22). In analyzing the two songs, Fernandez broke the song into sections and testified that there were variations to the structure of the songs. (Exh. C p. 18 lines 7-12.) Fernandez also conceded that the melodies were not the same. (Exh. C, p. 23-24, lines 25, 1-14.) Fernandez also testified that the second half of *Noche de Fiesta* contained syncopated half notes which made that section of the music different. (Exh. C, p. 24, 25, lines 15-25, 1-5.)

Not surprisingly, Fernandez admitted that it was common for a band to play similar sounding songs as a part of its repertoire.     (Exh. C, p. 29, lines 22-25.) Fernandez failed to consider, however, that the commercially released versions of *Noche de Fiesta* and *Nena Linda*, which Torres took no part in either, had similar musicians, arrangers, mixers and engineers. (True and correct copies of the CD covers for Gozadera and Commercial are attached hereto as Exhs. D and E, respectively.)

It is undisputed (i) that while both Vásquez nor Torres wrote the lyrics to both songs, neither wrote the music to either song at issue; (ii) that Israel Casado was the

musical arranger for both the originally released commercial versions of *Nena Linda* and *Noche de Fiesta*; (iii) that the commercially released versions of *Noche de Fiesta* and *Nena Linda* were played essentially by the same band; and (iv) that Torres did not commercially release *Noche de Fiesta*. Simply put, Torres did nothing to infringe on Vásquez's alleged Copyright of *Nena Linda*.

## DISCUSSION

Summary judgment may be granted when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995). "Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must come forward with specific facts to show that there is a factual question that must be resolved at trial." Velez v. Sebco Laundry Sys., Inc., 178 F.Supp.2d 336,339 (S.D.N.Y. 2001); Fed.R.Civ.P. 56(e). A non-moving party must produce evidence in the record and may not rely on "conclusory allegations, speculation or conjecture." Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

Viewing the evidence in the light most favorable to plaintiffs, and drawing all reasonable inferences in their favor, one still comes to the inescapable conclusion that there is no genuine issue as to any material fact and that Torres is entitled to judgment as a matter of law.

## POINT I

## PLAINTIFFS CLAIM IS TIME BARRED

The Second Circuit has held that a claim accrues under the Copyright Act "when a plaintiff knows or has reason to know of the injury upon which the claim is premised." Ackoff-Ortega v. Windswept Pacific Ent. Co. (Inc.) 120 F.Supp.2d 273, 279 (S.D.N.Y. 2000), citing Merchant v. Levy, 92 F.3d 56 (2d Cir. 1996). Thus, a plaintiff claiming to be an author of a copyrighted song "must seek a declaration of his rights within three years from the date he knows or has reason to know he has been deprived of those rights." Ackoff-Ortega v. Windswept Pacific Ent. Co. (Inc.) 120 F.Supp.2d 273, 279 (S.D.N.Y. 2000), citing Margo v. Weiss, 96 Civ. 3842, 1998 WL 2558, at 5 (S.D.N.Y. Jan. 5, 1998), aff'd, 213 F.3d 55, 59 (2d Cir. 2000).

As a general rule, an individual author is first deprived of his or her ownership rights in a copyrighted work at the time a copyright registration which fails to list the individual as an author is filed. Ackoff-Ortega v. Windswept Pacific Ent. Co. (Inc.) 120 F.Supp.2d 273, 279 (S.D.N.Y. 2000), citing Margo v. Weiss 1998 WL 2558. ("Any injury plaintiffs suffered by virtue of not receiving credit as author occurred the year in which the copyright certificate listing the lyricists as authors was filed."); see also Willsea v. Theis, 98 Civ. 6773, 1999 WL 595629, at 5 (S.D.N.Y. Aug. 6, 1999) ("[O]nce an author registers his copyright, any [unlisted] author exercising reasonable diligence should be aware that another person has clamed authorship."); Ackoff-Ortega v. Windswept Pacific Ent. Co. (Inc.) 120 F.Supp.2d 273, 279 (S.D.N.Y. 2000). Here, Vásquez was aware of the infringement since 1992 and was less then diligent in protecting his song *Nena Linda*.

Here, Torres filed his copyright on January 31, 2000. Vásquez was aware of the alleged infringement since 1993, yet plaintiffs' complaint was not filed until on or about January 25, 2006, nearly a year after the three year statute of limitations expired.

**POINT II**

**PLAINTIFFS CANNOT ESTABLISH THE ESSENTIAL
CRITERIA TO PROVE COPYRIGHT INFRINGEMENT**

There is no caselaw which support plaintiffs' claim that Torres' settlement with various defendants in the Puerto Rico Actions for the unauthorized commercial exploitation of three of Torres' lyrical composition is an infringement of *Nena Linda*. As noted in ULLOA v. Universal Music and Video Dist. Corp., 303 F.Supp.2d 409 (S.D.N.Y. 2004) copyright protection extends to two distinct aspects of music: (i) the musical composition, which is itself usually composed of two distinct aspects – music and lyrics . . . Staggers v. Real Authentic Sound, 77 F.Supp.2d 57, 61 (D. D.C. 1999.) Torres, unlike Vásquez, was diligent and commenced his actions in Puerto Rico to protect his lyrics. [1]

In a copyright infringement action, plaintiff may prove copying indirectly by showing: (1) the defendant had access to the plaintiff's work; and (2) there exists between the two works substantial similarity of protectible expression. Intersong USA v. CBS Inc., 757 F.Supp. 274 (S.D.N.Y. 1991), 3 M.B. Nimmer, *Nimmer on Copyright*, § 13.0[B] (1990). "More simply stated, the plaintiff must show that his work "was 'copied,' by proving access and substantial similarity between the works, and also show

---

[1] To prevail on a copyright infringement action a plaintiff must own a valid copyright. Williams v. Broadus, 2001 WL 984714 (S.D.N.Y. Mukasey) citing Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Plaintiffs failed to submit a Certificate of Registration for "*Nena Linda*" issued by the Register of Copyrights within five years of the song's first publication. The Copyright Certificate dated November 22, 2005, therefore, is not *prima facie* evidence of a valid copyright. *See* 17 U.S.C. § 410(c).

that his expression was 'improperly appropriated,' by providing that the similarities relate to copyrightable material." Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986) (citations omitted)." Intersong USA v. CBS Inc., 757 F.Supp. 274 (S.D.N.Y. 1991).

Plaintiffs cannot establish access or substantial similarity. Torres' work was created independently of the plaintiffs' work. Further, the music for both songs was created by Israel Cazado, not Vásquez or Torres. (Torres Dec. at ¶ 9; see also Exh. C and D.) Accordingly, Torres did not infringe on Vásquez's work. Eden Toys, Inc. v. Marshall Field & Co., 675 F.2d 498, 501 (2d Cir. 1982); American Greetings Corp. v. Easter Unlimited, Inc., 579 F.Supp. 607, 613 (S.D.N.Y. 1983).

"Access is hearing or having a reasonable opportunity to hear the plaintiff's work, in other words having the opportunity to copy. Bevan v. Columbia Broadcasting System, Inc., 329 F.Supp. 601, 604 (S.D.N.Y. 1971); Smith v. Little, Brown & Co., 245 F.Supp. 451 (S.D.N.Y. 1965), *Aff'd,* 360 F.2d 928 (2d Cir. 1966)." Intersong USA v. CBS Inc., 757 F.Supp. 274 (S.D.N.Y. 1991).

A plaintiff must offer significant, affirmative and probative evidence to support a claim of access. Intersong USA v. CBS Inc., 757 F.Supp. 274 (S.D.N.Y. 1991). Scott v. Paramount Pictures Corp., 449 F.Supp. 518, 520 (D.D.C. 1978), *aff'd,* 607 F.2d 494 (D.C. Cir. 1979), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980). Conjecture or speculation of access will not suffice. Alexander v. Irving Trust Co., 132 F.Supp. 364, 367 (S.D.N.Y.), *aff'd*, 228 F.2d 221 (2d Cir. 1955), *cert. denied*, 350 U.S. 996, 76 S.Ct. 545, 100 L.Ed. 860 (1956). Here, plaintiffs rely on conjecture and

speculation. There is no probative evidence that Torres had access to *Nena Linda* prior to writing *Noche de Fiesta*.

Plaintiffs have also claimed that *Noche de Fiesta* is a derivative work of *Nena Linda*. The test for whether a newly created work infringes the copyright holder's right to create a derivative work is the same as the test for whether that newly created work infringes the copyright holder's exclusive right to reproduce the copyrighted work itself. Williams, 2001 WL 984714. *See* 2 Nimmer § 8.09 at 8-137. If the latter work does not incorporate sufficient amounts of the pre-existing work as to constitute an infringement of either the reproduction right, or of the performance right, then it likewise will not infringe the right to make a derivative work because no derivative work will have resulted. Williams, 2001 WL 984174, *see also* Twin Peaks Prod. v. Publications Int'l, 996 F.2d 1366, 1373 (2d Cir. 1993).

Therefore, to establish that "*Noche de Fiesta*" is a derivative work of "*Nena Linda*" defendants must establish that (1) plaintiffs copied "*Noche de Fiesta*," and (2) the copying amounted to an improper or unlawful appropriation. Williams, supra, Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998) (quoting Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir. 1992)). Unlawful appropriation is established "by showing that the second work bears 'substantial similarity' to protected expression in the earlier work." Williams, supra, Castle Rock, 150 F.3d at 137 (citing Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997)); *see also id.* at 143 n. 9. If a secondary work transforms the expression of the original work such that the two works cease to be substantially similar, then the secondary work is not a derivative work and, for that matter, does not infringe the copyright of the original

work.") (citing 1 Nimmer § 3.01 at 3-3). Here, *Noche de Fiesta* is clearly an original work with many differences. (Exh. C; Fernandez Dep. at p. 16 to 25.)

The testimony of plaintiffs' expert, Angel Fernandez, establishes that the two songs are quite different. As noted above, Mr. Vásquez testified at deposition unequivocally that the two songs differ precisely in their structure and rhythm. (Exh. C; Fernandez Dep. at p. 16 to 25.)

In Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946), the Second Circuit set forth a two part test for determining the issue of substantial similarity. As stated in Walker, the Arnstein decision "framed a two-part test for similarity by drawing a distinction between noninfringing 'copying' on the one hand, which may be inferred from substantial similarities between the two works, and infringing 'illicit copying,' on the other, which demands that such similarities relate to protectible material." Walker, 784 F.2d at 51. On the issue of copying, the Second Circuit has held that "'analysis (dissection) is relevant, and the testimony of experts may be received.'" Walker, 784 F.2d at 51 (quoting Arnstein, 154 F.2d at 468). If copying is established under this first inquiry, only then does the Court consider the issue of illicit copying. On that issue "'the test is the response of the ordinary lay listener'" and expert testimony on this issue is inappropriate. Walker, 784 F.2d at 51 (quoting Arnstein, 154 F.2d at 468). *See generally* Note, The Role of the Expert Witness in Music Copyright Infringement Cases, 57 Fordham L.Rev. 127 (1988-89).

A song will be said to be substantially similar to another "if an ordinary person of reasonable attentiveness" would, upon listening to both works, conclude that the alleged infringer appropriated protectable expression. Pursuant to this test, two works are

13

substantially similar where "'the ordinary [listener], unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal of the two works as the same." Williams, supra, *Id.* at 139 (quoting Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1072 (2d Cir. 1992)).

Originality – *i.e.,* "distinguishable variation" and the presence of a "minimal element of creativity" – is a prerequisite to copyright protection. L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 490 (2d Cir. 1976), ULLOA, supra at 413. The Second Circuit has characterized the test of originality as modest, minimal," and "a low threshold." ULLOA, supra, citing to Dorham Indust. Inc. v. Tony Corp., 630 F.2d 905, 910 (2d Cir. 1950). As the Second Circuit explained in Eden Toys Inc. v. Florelee Undergarment Co., 697 F.2d 27, 34 (2d Cir. 1982), the standard for sufficient originality in whether the work contains some substantial, not merely trivial, originality. The standard for copyright infringement, by contrast, is whether the defendant's work is substantially similar to the plaintiff's work. Eden Toys 697 F.2d at 34; ULLOA, supra at 414.

Plaintiffs' expert establishes that the two works are sufficiently different so as to be considered original works.

## CONCLUSION

For the reasons stated herein above, the defendants' motion for summary judgment should be granted and the plaintiffs' complaint dismissed with prejudice.

Dated: January 18, 2007

Respectively submitted,

Bennett, Giuliano, McDonnell & Perrone, LLP
Attorneys for Defendant Fernando Torres-Negrón

William R. Bennett, III
225 West 34th Street, Suite 402
New York, New York 10122
Telephone:    (646) 328-0120

**TO:**    James Sheinbaum, Esq.
Bornstein & Sheinbaum
420 Lexington Ave., Suite 2920
New York, New York 10170
Telephone:    (212) 687-1600

## CERTIFICATE OF SERVICE

I, WILLIAM R. BENNETT, III, an attorney duly admitted to practice in the Courts of the State of New York and in this District, hereby certify that on January 18, 2007, I personally caused a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT to be served on plaintiffs FELIPE ROBLES VASQUEZ p/k/a RALDY VASQUEZ and CAMPESINO MUSIC ENTERTAINMENT GROUP, INC. via ECF and e-mail.

William R. Bennett, III

Z:\Documents\All Files\D492 Campesino Ent\Pleadings\Memo.011807.doc

# Exhibit A

Page 1

1
2

UNITED STATES DISTRICT COURT

3

SOUTHERN DISTRICT OF NEW YORK

4

5  FELIPE ROBLES VASQUEZ p/k/a      )
   RALDY VASQUEZ and CAMPESINO      )
6  MUSIC ENTERTAINMENT GROUP, INC.)
                                   )
7              Plaintiffs,         )
                                   )
8         vs.                      )No. 06 CV 0619
                                   )
9  FERNANDO TORRES NEGRON, TAMARA  )
   SOSA-PASCUAL and JULIO DE LA    )
10 ROSA-RIVE,                      )
                                   )
11             Defendants.         )
   ------------------------------)

12
13
14
15     DEPOSITION OF FELIPE ROBLES VASQUEZ
16           New York, New York
17        Thursday, September 7th, 2006
18
19
20
21
22
23 Reported by:
   Jeremy Frank, MPM
24 JOB NO. 187325a
25

Page 10

```
1              Vasquez
2     Q.   What instrument did you play in
3 that orchestra?
4     A.   Singer.
5     Q.   Do you know how to play a musical
6 instrument?
7     A.   Guitar.
8     Q.   Other than guitar, any other
9 instruments?
10    A.   Some piano but no.
11    Q.   How long were you in that
12 orchestra for?
13    A.   The orchestra, months, months, I
14 don't remember, months.
15    Q.   Did that orchestra record any
16 commercial musical releases when you were
17 singing for them?
18    A.   If the question is if I taped --
19         MR. SHEINBAUM:  Record.
20         Objection.
21    A.   I did not record with them.
22    Q.   So the answer is you never
23 recorded a commercially released record, album
24 or song with that orchestra, with this group?
25    A.   No.
```

Page 11

```
1              Vasquez
2         MR. SHEINBAUM:  Objection to the
3 translation.  It was to release the
4 record, not to tape.
5         MR. BENNETT:  My question was my
6 question.  If you have an objection,
7 please note it on the record.
8         MR. SHEINBAUM:  I did.
9         MR. BENNETT:  Just say objection to
10 the translation, that's it.  You're
11 interrupting the questioning.
12        MR. SHEINBAUM:  No, I have to,
13 since he's not going to be there at
14 court, I have to say what the translation
15 was as it was incorrect.
16        MR. BENNETT:  You're coaching the
17 witness.  You're not a court-sponsored
18 interpreter so please stop with the
19 interruptions.
20    Q.   After being part of the orchestra
21 called Los Hijos Del Rey, what was your next
22 employment in the musical industry?
23    A.   Same.  Later I formed part of the
24 of the Santo Domingo All Star Band.
25    Q.   Do you recall the year that you
```

Page 12

```
1              Vasquez
2 worked for Los Hijos Del Rey?
3     A.   In '82.
4     Q.   When did you start the Santo
5 Domingo All Star Band?
6     A.   In 1983.
7     Q.   What was your position in the
8 band?
9     A.   Singer.
10    Q.   Who was the owner of the band?
11    A.   Maestro Felix Del Rosario.
12    Q.   How long were you part of the
13 Santo Domingo All Star Band?
14    A.   That was also just months, I don't
15 remember how long.
16    Q.   Did you write any music for Los
17 Hijos --
18    A.   Yes, not totally, it was part of a
19 song.
20    Q.   What was the part of the name of
21 the song that you --
22    A.   I don't remember.
23         I remember that it was a song
24 dedicated to Puerto Rico, the lyrics weren't,
25 hadn't been decided on.  And I finished, well
```

Page 13

```
1              Vasquez
2 I made part of the song.
3     Q.   When you say song, do you mean
4 musical composition or lyrics?
5     A.   No, the lyrics they were, it was
6 almost finished.
7     Q.   Who did you collaborate with?
8         MR. SHEINBAUM:  Objection.
9     A.   I don't remember who the composer
10 was.  I just knew that I had to finish it and
11 I did.
12    Q.   Were you paid for your
13 participation in collaborating with those
14 lyrics?
15    A.   No, I was a newcomer at that time
16 and --
17    Q.   Am I correct that you cannot read
18 music?
19    A.   No.
20    Q.   You can read music?
21    A.   No.
22    Q.   So when I say that you cannot read
23 music, I am correct?
24    A.   No, I can't write music.
25    Q.   Okay.
```

4 (Pages 10 to 13)

Page 14

Vasquez

1
2     MR. SHEINBAUM:  Read.
3     THE INTERPRETER:  He said write.
4     Q.   Let me ask you this.
5     How long were you in the Santo
6 Domingo All Star Band?
7     A.   I don't remember, months also.
8     Q.   After you were part of the Santo
9 Domingo All Star Band, what did you do next?
10    A.   I kept living in Puerto Rico, I
11 started with Oro Negro Orchestra.
12    Q.   What was your position with
13 that --
14    A.   Singer.
15    Q.   -- orchestra?
16    A.   Singer, I wrote a song there.  The
17 first time I wrote a song.  It was a song that
18 was recorded because I was writing it.
19    Q.   What was the name of that song?
20    A.   Truth is, I don't remember.
21    Q.   Who was the leader of the Oro
22 Negro Orchestra?
23    A.   Domingo Peguero.  They called him
24 Oro Negro, black gold.
25    Q.   How long were you at that

Page 15

Vasquez

1
2 orchestra for?
3     A.   With that orchestra, less than a
4 year, it was also months.
5     Q.   Was that months in 1983 or months
6 in 1984?
7     MR. SHEINBAUM:  Objection.
8     A.   Truth is I don't remember what
9 year that was.
10    Q.   After working with Oro Negro
11 Orchestra, what was the next employment that
12 you had in the music industry?
13    A.   With the orchestra Tempo
14 Dominicano and that's where I did start
15 writing songs.
16    Q.   When you say writing songs, do you
17 mean lyrics?
18    A.   Lyrics and music both.  You're
19 asking me two different things here.
20    Q.   When you were working with Tempo
21 Dominicano, did you write lyrics?
22    A.   Yes.
23    Q.   Did you compose music?
24    A.   I need to clear something up.
25    Music what we call is the

Page 16

Vasquez

1
2 intonation and the melody of the song.  My
3 songs all have their own melodies.
4     Q.   I understand that.
5     But did you actually write notes
6 on a piece of paper?
7     A.   Notes, no.
8     Q.   Did you write words on a piece of
9 paper?
10    A.   Lyrics with melodies.
11    Q.   And the melody that you speak of,
12 what melody was that in terms of genre, was it
13 samba, salsa, something else?
14    MR. SHEINBAUM:  Objection.
15    A.   Could be merengue, could be a
16 ballad, could be salsa.
17    Q.   How long did you work for Tempo
18 Dominicano?
19    A.   More than a year.  I don't
20 remember exactly, two.
21    Q.   Then after working with Tempo
22 Dominicano, who did you work with next?
23    A.   After Tempo Dominicano I started
24 my orchestra.
25    Q.   What was the name of that

Page 17

Vasquez

1
2 orchestra?
3     A.   Raldy Vasquez and His Orchestra.
4     Q.   Do you recall what year you
5 started?
6     A.   In '87.
7     Q.   Did you incorporate your
8 orchestra?
9     A.   No, not really.
10    Q.   Did you form any corporation to
11 hold the orchestra?
12    A.   No.
13    Q.   Is there still a Raldy Vasquez and
14 His Orchestra today?
15    A.   No.
16    Q.   When did the orchestra stop
17 playing?
18    A.   I think '93, I think.
19    Q.   After working in Raldy Vasquez and
20 His Orchestra, what did you do next in the
21 musical industry?
22    MR. SHEINBAUM:  Objection.
23    A.   I started writing completely for
24 other artists.
25    Q.   How long have you been writing for

5 (Pages 14 to 17)

Page 38

Vasquez

1
2 creating the melody for Nena Linda?
3    A.   No.
4    Q.   When did you first hear the song
5 Noche de Fiesta?
6    A.   In the year that they were
7 promoting it, 1993.
8    Q.   At that time what did you do after
9 you first heard that song?
10    A.   I listened to it.   It was a group
11 that didn't grab my attention.
12    Q.   After hearing the song Noche de
13 Fiesta in 1993, that group that was performing
14 that song did not grab your attention?
15    A.   No.
16        MR. SHEINBAUM:  Objection.
17    Q.   Do you recall the year that you
18 went into the office of J&N and they told you
19 about the lawsuit?
20    A.   If I remember in what year?
21    Q.   Yes.
22    A.   It was now, 2006 when I went in to
23 the office, like I said, to show them a
24 product.
25    Q.   Was that 2005 or 2006?

Page 39

Vasquez

1
2    A.   No, 2006.
3    Q.   Do you recall what month?
4    A.   I don't remember if it was in
5 January, the truth is, well I think it was
6 January.
7    Q.   Do you recall when you testified
8 in the federal court in Puerto Rico?
9    A.   If I remember?
10    Q.   Yes.
11    A.   Yes.
12    Q.   When?
13    A.   In February, I think.
14    Q.   February of 2006?
15    A.   Yes.
16    Q.   Were you living in the Dominican
17 Republic at that time?
18    A.   Yes.
19    Q.   Did someone pay you to fly to
20 Puerto Rico to testify?
21    A.   Yes.
22    Q.   Did someone pay for your hotel
23 stay there?
24    A.   Yes.
25    Q.   Did someone pay for your food that

Page 40

Vasquez

1
2 you ate while you were there?
3    A.   Yes.
4    Q.   Did someone pay you to testify?
5    A.   No.
6    Q.   Did you ask anyone to pay you for
7 days of work that you may have missed?
8    A.   No.
9    Q.   How many times in 1993 did you
10 hear the song Noche de Fiesta?
11    A.   I couldn't tell you.
12        Truthfully I heard it on the radio
13 and stuff in part because really that group
14 wasn't anything important in the industry.
15    Q.   Was Noche de Fiesta on a tape, CD,
16 eight-track tape when you first listened to
17 it?
18        MR. SHEINBAUM:  Objection.
19    A.   I heard it on the radio, I didn't
20 hear it in any --
21    Q.   Okay.
22        Do you recall the name of the
23 group?
24    A.   Yes.
25    Q.   What was the name of the group?

Page 41

Vasquez

1
2    A.   Gozadera, G-o-z-a-d-e-r-a.
3    Q.   Do you recall when the album
4 Comercial was first released?
5    A.   Yes, in '92.
6    Q.   Do you know how many copies it
7 sold in 1992?
8    A.   The truth is I don't.
9    Q.   And --
10    A.   I wasn't really paying attention
11 to that.
12    Q.   Who assisted you in producing
13 Comercial?
14        MR. SHEINBAUM:  Objection.
15    A.   I did it.   I found the arrangers,
16 all the songs are mine.
17    Q.   Do you know where Comercial was
18 produced?
19    A.   Yes, in Playback Studio.
20    Q.   How many copies did the initial
21 release issue?
22    A.   The truth is I don't know.
23    Q.   Was it more than 1,000?
24    A.   Truthfully, I don't know anything
25 about that.

11 (Pages 38 to 41)

# Exhibit B



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form PA**
For a Work of Performing Arts
UNITED STATES COPYRIGHT OFFICE

**PA 1-267-305**

EFFECTIVE DATE OF REGISTRATION

11 . 3 . 05

Month          Day          Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**
**TITLE OF THIS WORK ▼** Tengo un problema,
Rompiendo barreras, La fiesta, Se acabo, Nena linda, Una n che nada mas, El precio de mi error

**PREVIOUS OR ALTERNATIVE TITLES ▼**
n/a

**NATURE OF THIS WORK ▼** See instructions

Words and music/Songs contained on 1993 musical production entitled "COMERCIAL" Raldy Vasquez

**2**
**a** **NAME OF AUTHOR ▼**
Felipe Vasquez Robles aka Raldy Vasquez

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1958   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ___ USA
Domiciled in ___

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☑ No
Pseudonymous?   ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
words and music to all titles

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ___
Domiciled in ___

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ___
Domiciled in ___

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**
**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given
1992   Year in all cases.

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ___ USA   Day 30   Year 1993   Nation

**4**
**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Raldy Vasquez dba Viorli Music C/o Campesino Ent. Group, Inc.
24 White Birch Drive, Pomona, NY 10970

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

By written agreement

APPLICATION RECEIVED
NOV 03 2005
ONE DEPOSIT RECEIVED
NOV 03 2005
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages


DEFENDANT'S
EXHIBIT A

EXAMINED BY _LLF_                                      **FORM PA**

CHECKED BY

☐ CORRESPONDENCE                                      **FOR**
  Yes                                                 **COPYRIGHT**
                                                      **OFFICE**
                                                      **USE**
                                                      **ONLY**

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼              **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**6**

See instructions before completing this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼                                  **Account Number** ▼

                                            **THOMSON COMPUMARK**
                                            **DA 061794**

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Campesino Entertainment Group, Inc. Attn: Carlos Martin Carle- Copyright Administration
24 White Birch Drive, Pomona, NY 10970

**b**

Area code and daytime telephone number  ( 917 ) 771-7914              Fax number  (          )

Email  campesinomusic@aol.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of _Viorli Music_
  Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**Typed or printed name and date** ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Carlos Martin Carle                                      Date  11/2/2005

Handwritten signature (X) ▼

☞  x _(signature)_

Certificate will be mailed in window envelope to this address:

**Name** ▼
Viorli Music C/o Campesino Entertainment Group - Administrator

**Number/Street/Apt** ▼
24 White Birch Drive

**City/State/ZIP** ▼
Pomona, NY 10970

• Complete all necessary spaces
• Sign your application in space 8

1. Application form
2. Nonrefundable filing fee in check or money order payable to *Register of Copyrights*
3. Deposit material

Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev. June 2002—20,000  Web Rev. June 2002  ⊛ Printed on recycled paper                    U.S. Government Printing Office: 2000-461-113/20 021

LIBRARY OF CONGRESS

*Copyright Office*
*of the United States*

WASHINGTON, D.C.

DEFENDANT'S
EXHIBIT L
JF 9· p06
Blumberg No. 5114

**THIS IS TO CERTIFY** that on November 3, 2005, a claim to copyright a work identified as **TENGO UN PROBLEMA, ROMPIENDO BARRERAS, LA FIESTA, SE ACABO, NENA LINDA, UNA N CHE NADA MAS, EL PRECIO DE MI ERROR** was registered under number **PA 1-267-305.** This work was registered in accordance with provisions of the United States Copyright Law. (Title 17 United States Code)

**THIS IS TO CERTIFY FURTHER**, that the attached is an additional certificate for this work; it is identical to the original certificate which was issued in 2005.

**IN WITNESS WHEREOF**, the seal of this Office is affixed hereto on January 26, 2006.

Marybeth Peters
Register of Copyrights

By:    Tracie M. Coleman
Head
Certifications and Documents
Section
Information and Reference
Division

Use of this material is governed by the U. S. Copyright law 17 U.S.C. 101 et seq.

# Exhibit C

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------------------x

5  FELIPE ROBLES VASQUEZ p/k/a RALDY VASQUEZ

6  and CAMPESINO ENTERTAINMENT GROUP, INC.,

7                          Plaintiffs,

8          - against -

9  FERNANDO TORRES NEGRON, TOMARA SOSA --

10  PASUCAL, and JULIO DE LA ROSA-RIVE,

11                          Defendants.

12  ------------------------------------------x

13                          November 22, 2006

                          11:00  a.m.

14

15          DEPOSITION of ANGEL FERNANDEZ,

16  taken by the Defendants, pursuant to

17  Notice, held at the offices of Borstein &

18  Sheinbaum, LLP, 420 Lexington Avenue, New

19  York, New York, before Debbie Zaromatidis,

20  a Shorthand Reporter and Notary Public of

21  the State of New York.

22

23

24

25

16

1                    FERNANDEZ

2       Q.    Now, you used the words

3   "virtually identical."  Is it fair to say

4   that they are not exactly identical,

5   correct?

6       A.    Right.

7       Q.    Okay.  And the next sentence

8   reads, "An ordinary listener or

9   professional musician will not be able to

10  distinguish between the two melodies."

11      A.    Um hum.

12      Q.    Is that true?

13      A.    Yes.

14      Q.    Moving on to page 2, in the

15  first full paragraph on the third -- the

16  fourth line down it starts with the

17  sentence "Any differences that occur in

18  these sections after the first two

19  measures are simply variations of the

20  stated motifs."

21          Do you see that?

22      A.    Yes, I do.

23      Q.    So you agree with me that there

24  are certain differences contained within

25  the music?

17

1                     FERNANDEZ

2        A.     Yes.

3        Q.     Okay.   The lyrics are obviously

4    different, correct?

5        A.     Yes.

6        Q.     And as a result of the

7    difference in lyrics some notes may be

8    added to certain measures to account for

9    the words and the syllables in the words,

10   correct?

11            MR. SHEINBAUM:    Objection.

12       Q.     You can answer.

13       A.     For -- yes, for any added or

14   subtracted syllables.

15       Q.     And the last sentence in that

16   report says "Thus the rhythm was changed

17   slightly to accomodate the added note." Do

18   you see that?

19       A.     Um hum.

20       Q.     And that is correct, right?

21       A.     Yes.

22       Q.     Going down to the second

23   paragraph the way you've broken the songs

24   out into sections, in the second sentence

25   it says "Sections A, A 2, A 3, and A 4 of

20

1        FERNANDEZ

2            (Record read.)

3        A.    Okay.   The -- the

4    original -- the Nena Linda does have the

5    exact rhythm as the first measure of

6    letter A.   Noche de Fiesta has a variation

7    of that first measure.

8        Q.    Okay.

9        A.    It is the same note in an octave

10    lower, but if you look five measures later

11    it is the same rhythm.

12        Q.    Understood.

13        A.    So that the difference in this

14    and that is the number of syllables.

15        Q.    Okay.

16        A.    The difference in -- in measure

17    one and measure five of Noche de Fiesta is

18    just the number of syllables.   It is the

19    same idea.

20        Q.    Does that alter the rhythm at

21    all?

22        A.    Yes.

23        Q.    In the fifth paragraph down, the

24    last sentence when you are talking about

25    the lyrics of Nena Linda, you state

23

FERNANDEZ

1

2  identical nature of the melodies in Nena

3  Linda and Noche de Fiesta is readily

4  recognized by the listener, it is further

5  recognized by the attached musical

6  notation."  Do you see that?

7      A.    Right.

8      Q.    And that is a true and accurate

9  statement?

10     A.    Yes.

11     Q.    In the next paragraph down,

12 middle of the third line at the end after

13 a comment it says "The melodies are

14 virtually identical."

15         Do you see that?

16         MR. SHEINBAUM:   Which line is

17 it?  I am sorry.

18         MR. BENNETT:   The third line

19 down in the third paragraph.

20     A.    Okay.

21     Q.    After the comment "the melodies

22 are virtually identical."  Do you see

23 that?

24     A.    I see that.

25     Q.    So the melodies are not exactly

24

1                    FERNANDEZ

2    identical, correct?

3        A.    They are -- they have

4    differences.  They are based on the

5    same -- the same melody on the -- there

6    are differences that I -- that are there

7    to accomodate the lyrics, which were

8    written in my opinion based on -- on the

9    Nena Linda, the lyrics of Noche de Fiesta.

10       Q.    But are the melodies identical

11   or virtually identical?

12       A.    They are -- they are not

13   identical.  They are virtually identical.

14   They are not note for note identical.

15       Q.    Going to the next page, page 4,

16   the third line down which starts

17   "however," it says, "However the second

18   half of Noche de Fiesta contains a

19   syncopated eighth note.

20       A.    Where --

21       Q.    It is (indicating) -- "However,

22   the second half of Noche de Fiesta

23   contains a syncopated eighth note followed

24   by a quarter note whereas Nena Linda

25   contains four eighth notes."

25

1                          FERNANDEZ

2        A.      Right.

3        Q.      So they are different in that

4    section of the music, correct?

5        A.      Yes.

6        Q.      In the next paragraph down again

7    the third line starts with "Although the

8    work is different, there are introductions

9    in mambos."

10               Do you see that?

11               MR. SHEINBAUM:    Where is that?

12       Q.      It is the third paragraph, third

13   line starting with the word "although."

14       A.      Right.

15       Q.      The two songs have different

16   introductions?

17       A.      Yes.

18       Q.      Okay.   What -- what is a mambo?

19   If you could describe it in words.

20       A.      It's an instrumental section

21   usually, breaks up the lyrics, the song.

22   It's not part of the composition.

23       Q.      Okay.   Turning to the next page,

24   you'll see that that --

25               MR. SHEINBAUM:    Page 5.

29

FERNANDEZ

1
2  who is playing, ZZ Top, for example, not
3  many differences in their music.  So would
4  it be correct to say that there are
5  certain musicians who have a certain style
6  that is common from year one that they
7  played to year ten?  I mean they just have
8  a style, correct?
9      A.    Yeah.  If -- I haven't heard
10 Chuck Mangione in a while.  If I heard him
11 now, he might be playing a little bit
12 differently than the last time I heard
13 him, which was like ten years ago.
14     Q.    If you got a group of people
15 together, who have played together for a
16 long time, their songs would sort of sound
17 the same.  They may have different styles,
18 but the manner in which they play would be
19 the same, correct?
20          MR. SHEINBAUM:   Objection.  You
21 have to give him a specific.  That is --
22     Q.    Would you find it unusual
23 to -- for a band to play two songs which
24 are similar?
25     A.    No.

# Exhibit D



GOZADERA

■ *Bailando y Gozando con...*

1. FUE UN BIEN 4:32
(EXITO ARIAS, ANTONIO)

2. NOCHE DE FIESTA 4:45
(FERNANDO TORRES)

3. MUEVE MUEVE 5:02
(HECTOR PEÑA, ANTONIO)

4. DIME QUE ME QUIERE 4:17
(PEDRITO)

5. GOZADERA 4:28
(ALFREDO VALQUEZ, ANTONIO)

6. MARCHATE 4:16
(HECTOR TORRES)

7. BEBO POR TI 4:39
(FERNANDO TORRES)

8. QUISIERA DETENER EL TIEMPO 4:45
(PEDRITO)

9. NOCHE DE FIESTA REMIX (SALSA) 6:39

DISTRIBUCION:
En U.S.A.: J&N Records Dist.
764 10th Ave. New York, NY 10019
Tel. (212) 265-1313
Fax (212) 265-1349

℗ © 1994 J&N Records Dist.
764 10th Ave. New York, NY 10019
Tel. (212) 265-1313
Fax (212) 265-1349

ALL RIGHTS RESERVED
UNAUTHORIZED DUPLICATION
IS A VIOLATION OF APPLICABLE LAWS.

Manufactured and printed by Disc Makers, Phila/USA, U.S.A.

9 2011 0 57966 7

**EXHIBIT**

PERSONAL

ELY RAMOS
DIRECTOR, PIANO • HECTOR LUIS RAMOS
BAJO, DIRECTOR MUSICAL • DAVID RUIZ ROSARIO
PRIMERA TROMPETA • CARLOS JAVIER - ROSARIO
SEGUNDA TROMPETA • NELSON RODRIGUEZ ORTIZ
TROMBON • ELIZABETH RAMOS
SAX ALTO • HIRAM RIVAS
SAX TENOR • ANGEL RAFAEL ORTIZ
GÜIRA • VICTOR RAFAEL CORDERO
CONGAS • JOSE A. MALDONADO
TIMBALA • RUBEN CANUELAS
CANTANTE Y CORO • JOHNNY SANTIAGO
CANTANTE Y CORO • MIGSOTY DE LEON
BAILARINA • MILLIE PABON

GOZADERA ES UNA CREACION EXITOSA DE ANTONIO RIVERA

PRODUCTORA MUSICAL • ANTONIO RIVERA
DIRECCION MUSICAL • YSRAEL CASADO
ARREGLOS • ISRAEL CASADO, ALFREDO VELAZQUEZ

GRABADO EN PLAY BACH STUDIOS
MEZCLADO POR • RAMON MARTINEZ, ANTONIO VELAZQUEZ
FOTOGRAFIA • JORGE VELAZQUEZ
MAQUILLAJE • IRIS PAGAN

PARA CONTRATACIONES EN PUERTO RICO:
(809) 723-5355- MILLY

EN SANTO DOMINGO:
(809) 688-5902

EN ESTADOS UNIDOS:
(212) 265-3071 - LEO ANDUJAR

AGRADECIMIENTO A LOS
SIGUIENTES MUSICOS:
JOSE DIAZ
JOEL SANCHEZ
HECTOR HERRERA
RAFAEL BRITO
ELIAS LOPEZ
RAFIN GUIRA
RADY BAJO

MANUFACTURADO E IMPRESO POR
DISC MAKERS, PHILADELPHIA, U.S.A.

HMS110CD

HMS
RECORDS



# Exhibit E



Músicos Invitados:
**ELIAS LOPEZ / Trompeta**
**JOSE DIAZ / Saxofones**
**JOEL SANCHEZ / Bajo***
**ISRAEL CASADO / Piano***

Estudio de Grabación:
**PLAYBACH STUDIO**
Ingeniero: RAMON MARTINEZ
Ingeniero: CARLOS VELAZQUEZ
Fotografía: LUIS RUIS

Autor De Todos Los Temas:
**RALDY VASQUEZ**

*Raldy Vásquez y Alegría
**Israel Casado
***Guillermo Torres
****Raldy Vásquez y Juan Valoy

Quiero dedicar mi nueva producción con todo mi amor a mi madre, "María de los Angeles Robles", a mi abuelita, "Ana Dilia Robles", porque gracias a su gran esfuerzo y dedicación puedo decir que nunca me faltó nada. !Que Dios las bendiga!

También a mis hijas Orlyn, Viviana, Linete, porque ellas son la fuente de inspiración que me da fuerza cada día para seguir adelante. !Las Amo!

**PARA CONTRATACIONES**
748-0611
Beeper 250-0140
Unidad 3955



1. ROMPIENDO BARRERAS*
2. LA FIESTA
3. SE ACABO****
4. SE QUE TE PERDI***
5. NENA LINDA*
6. UNA NOCHE NADA MAS**
7. EL PRECIO DE MI ERROR*
8. TENGO UN PROBLEMA*